**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ROBYN D. SCOTT, f/k/a ROBERT D.
SCOTT,

                              Plaintiff,

        v.                                          9:12-CV-1551
                                                    (MAD/DJS)

CARL KOENIGSMANN, M.D.,
                              Defendant.

---

APPEARANCES:                          OF COUNSEL:

**ROBYN SCOTT**
**Plaintiff, pro se**
**7 Mill Street**
**#5**
**Batavia, New York 14020**

**HON. ERIC T. SCHNEIDERMAN**          **ADRIENNE J. KERWIN, ESQ.**
**Attorney General for the**           **Assistant Attorney General**
**State of New York**
**Attorney for Defendant**
**The Capitol**
**Albany, New York 12224-0341**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Robyn D. Scott, formerly known as Robert D. Scott ("Plaintiff"), who is

proceeding *pro se* and *in forma pauperis*, commenced this action alleging that Carl Koenigsmann,

M.D.[1] ("Defendant") was deliberately indifferent to her alleged inadequate medical care in

---

[1] Upon review of the within motion, the Court notes that Defendant's name is spelled
incorrectly on the docket report for this action.  The Clerk of the Court is directed to modify the
docket accordingly.

violation of her Eighth Amendment rights.[2] *See generally* Dkt. No. 7. Currently before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 65. Plaintiff has responded to the motion. *See* Dkt. No. 71.

## II. BACKGROUND

In support of the motion for summary judgment, Defendant submitted a "Statement of Material Facts" pursuant to Local Rule 7.1(a)(3) with exhibits including Plaintiff's deposition transcript and copies of Plaintiff's medical records.[3] Plaintiff has not objected to the authenticity of any documents annexed to Defendant's motion. Therefore, to the extent that the "facts" asserted by Defendant are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion. *See U.S. v. Painting known as Hannibal*, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing *Daniel v. Unum Provident Corp*., 261 F. App'x 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)); *see also N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc*., 426 F.3d 640, 648–49 (2d Cir. 2005).

Plaintiff did not provide a response to Defendant's Statement of Material Facts. Despite

---

[2] As a result of previous motion practice, the only remaining claim against Defendant is Plaintiff's Eighth Amendment claim related to her medical care between February 7, 2012 and October 24, 2012. Dkt. No. 41 at 21; Dkt. No. 43.

[3] Local Rule 7.1(a)(3) states:

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

this omission, courts are flexible with their interpretation of the Local Rules to, "prevent the elevation of procedure over substance where the evidence submitted by the parties has pointed to the existence of disputed material of facts." *Rivera v. Nat'l R.R. Passenger Corp.*, 152 F.R.D. 479, 483 (S.D.N.Y. 1993) (citations omitted). The Court has broad discretion to decide whether to overlook the failure to comply with local rules and perform an independent review of the record. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Monahan v. City of N.Y. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000); *see also Cruz v. Church*, 2008 WL 4891165, at *3, n. 4 (N.D.N.Y. 2008) (collecting cases) (holding that the plaintiff was not so experienced at federal court litigation that the special leniency normally afforded to pro se litigants should have been diminished). If the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit in opposing a motion for summary judgment. *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). In considering whether there are material issues of fact "[a] verified complaint is to be treated as an affidavit for summary judgment purposes . . . provided that it meets the other requirements for an affidavit" under Rule 56. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). To be sufficient to create a factual issue, "a verified complaint must be based on personal knowledge." *Gill v. Frawley*, No. 02-CV-1380, 2006 WL 1742738, at *4 (N.D.N.Y. June 22, 2006) ("An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere 'information and belief' or hearsay"). The affidavit or verified pleading is insufficient to create a factual issue where it is "unsubstantiated by any other direct evidence." *Id.*

Here, plaintiff's amended complaint includes the following language, "I declare under penalty of perjury that the foregoing is true and accurate." *See* Dkt. No. 7 at 10. "Ordinarily, [ ]

sworn allegation[s] [ . . . ] are sufficient to constitute evidence for purposes of a motion for summary judgment. "  *See Taylor v. Artus*, No. 9:05-CV-0271, 2007 WL 4555932, at *6 (N.D.N.Y. Dec. 19, 2007).  Accordingly, with the aforementioned caveats in mind, the amended complaint will be treated as an affidavit.

## A.    Facts[4]

Plaintiff commenced this suit while she was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  Dkt. No. 7 at ¶ 3.  Plaintiff has since been released from DOCCS' custody.  Dkt. No. 30.  At all times relevant to this action, Defendant was employed by DOCCS as Deputy Commissioner and Chief Medical Officer.  Dkt. No. 65-4 at ¶ 1.  He is responsible for the development and implementation of medical policies and practices for inmates in the custody of DOCCS.  *Id.* at ¶ 3.  Defendant does not provide medical care to individual inmates.  *Id.* at ¶ 5.

In 2003, Plaintiff entered DOCCS.  Dkt. No. 7 at ¶ 7.  From February 2012 through October 2012, Plaintiff was treated by DOCCS medical staff at Mid-State Correctional Facility ("Mid-State C.F.") and Gowanda Correctional Facility ("Gowanda C.F.").  Dkt. No. 66, *generally*.  In February 2012, Plaintiff was confined at Mid-State C.F. and received the following prescription medications: Ultram/Tramadol (50 mg)[5], Neurontin (600 mg)[6], Elavil (10mg)[7],

---

[4]   The facts, as discussed herein, are for the relevant time period as referenced in the amended complaint.

[5]   Prior to 2012, while in DOCCS' custody, plaintiff received a prescription for Ultram/Tramadol for back pain.  Dkt. No. 66-9 at 12; Dkt. No. 66-10 at 16; *see also* http://www.nih.gov (Last visited March 9, 2016) ("Ultram" is a brand name of Tramadol).

[6]   In 2004, DOCCS medical staff prescribed Neurontin for "neuropathy pains."  Dkt. No. 66-11 at 16; Dkt. No. 66-13 at 9.

[7]  Prior to 2012, during her confinement at DOCCS, Plaintiff received a prescription for

(continued...)

Fluocinonide topical cream[8] and Claritin-D (1 tablet per day). Dkt. No. 7 at ¶ 8; Dkt. No. 66-2 at 10; Dkt. No. 66-8 at 8. On February 16, 2012, plaintiff was treated by a nurse practitioner for ongoing sinus congestion with a chronic running nose. Dkt. No. 66-2 at 11. Plaintiff requested a renewal of her prescription for Robaxin and was advised that the medication was not "indicated for long term use." *Id.* Plaintiff was diagnosed with allergic rhinitis and received a prescription for Nasacort spray. *Id.*

In March 2012, Plaintiff received the following prescription medications: Prilosec (20 mg); Nasacort and Amitriptyline (10 mg)[9]. Dkt. No. 66-2 at 9. On March 3, 2012, Plaintiff wrote a letter to Defendant. Dkt. No. 65-5 at 1. As part of Defendant's office procedures, when inmate letters are received, they are reviewed by administrative staff who determine which Division of Health Services official should receive the correspondence to prepare a response. Dkt. No. 65-4 at ¶ 6. In the March 3, 2012 correspondence, Plaintiff complained that she did not receive a TENS unit and requested a specialist that "know[s] my injuries and treated me from the beginning at the pain management center."[10] Dkt. No. 65-5 at 1.

On March 6, 2012, plaintiff received a TENS Unit. Dkt. No. 66-2 at 10. On the same day, Plaintiff wrote a letter to Defendant stating, "I received the TENS Unit today. Thank you." Dkt. No. 65-5 at 8. Plaintiff also informed Defendant that her 1983 civil suit was "on hold"

---

[7](...continued)
Elavil (a brand name for Amitriptyline), a muscle relaxer, to ingest at bedtime. Dkt. No. 66-5 at 20; Dkt. No. 66-5 at 24; *see also* http://www.nih.gov (Last visited March 9, 2016).

[8] Prior to 2012, DOCCS medical staff prescribed Fluocinonide/Lidex topical cream for skin irritation. Dkt. No. 66 at 22; *see also* http://www.drugs.com (Last visited March 9, 2016).

[9] *See* Footnote 7, *supra.*

[10] Prior to 2012, while in DOCCS' custody, plaintiff received a prescription for a TENS Unit for "paraspinal muscle tenderness and upper neck and back areas." Dkt. No. 66-5 at 20.

because she hoped to receive relief from her pain with the TENS unit. *Id*

On March 14, 2012, at Defendant's request, Peter Bogarski ("Bogarski"), Regional Health Services Administrator, responded to Plaintiff's "recent letters". Dkt. No. 65-5 at 5. Bogarski confirmed that Plaintiff received the TENS unit. *Id.* Bogarski also advised Plaintiff that her medications were ordered by a primary care provider and that any change in medication must be discussed with that provider. *Id.* Plaintiff was urged to bring her health concerns to the attention of the health care staff utilizing sick call procedures. *Id.*

On April 2, 2012, plaintiff attended Sick Call and requested batteries for her TENS Unit. Dkt. No. 66-2 at 8. On April 12, 2012, Plaintiff wrote a letter to Defendant requesting a battery and "pads" for the TENS Unit. Dkt. No. 65-5 at 11. Plaintiff claimed that she was "told" that she would receive one replacement battery every six weeks and "pads" once per year. *Id.* Plaintiff explained that this would allow her to use the TENS Unit on only one area, at a low to medium setting, every three to five days. *Id.* Plaintiff stated that she needed to use the unit on four areas every two to three days, at the "highest setting" as previously prescribed by her doctor. *Id.* Plaintiff complained that the medication was "half of what [her] doctor recommended." Dkt. No. 65-5 at 11. Plaintiff asked for the "needed" batteries and pads "from time to time." *Id*.

On April 13, 2012, plaintiff was diagnosed with acute sinusitis and given a "Z-pack" and Nasacort. Dkt. No. 66-2 at 6. Plaintiff also requested and received a renewal of her prescription for Motrin (600 mg). Dkt. No. 66-2 at 6.

On April 20, 2012, Plaintiff wrote a letter to Defendant.[11] Dkt. No. 7 at ¶ 28. In the April 20, 2012 correspondence, Plaintiff complained that she endured "small abuses, such as crushing

---

[11] Defendant claims that his office has no record of the letter. Dkt. No. 65-4 at ¶ 10. The letter was annexed to Plaintiff's amended complaint. Dkt. No. 7 at 23.

one of her medications for no reason." *Id.* at 23. Plaintiff stated that the "little pain medication" she received was "taken away" and claimed that Defendant ordered staff to "take away half of the muscle relaxers I need." *Id*.

In May 2012, Plaintiff received the following prescription medications: Fluocinonide topical cream, Nasacort, Claritin-D and Selenium Sulfide (for dandruff). Dkt. No. 66-2 at 4, 5. On May 15, 2012, Plaintiff received a replacement battery for her TENS Unit. *Id.* On May 22, 2012, plaintiff was treated by a nurse practitioner for facial pressure, sinus congestion and nasal discharge. Dkt. No. 66-2 at 5. Plaintiff was diagnosed with chronic sinusitis and prescribed Cipro. *Id.*

In June 2012, Plaintiff received the following daily prescription medications: Elavil (10 mg), Neurontin (600 mg), Ultram/Tramadol (50 mg) and Claritin-D (1 tablet). Dkt. No. 66-7 at 23; Dkt. No. 66-8 at 1, 6. On June 8, 2012, at Defendant's request, Bogarski responded to Plaintiff's "recent letters." Dkt. No. 65-5 at 9. Bogarski advised Plaintiff to report to Sick Call for batteries and pads for her TENS Unit. *Id.* Bogarski also suggested that Plaintiff discuss the frequency of replacements at that time. *Id.* On June 15, 2012, Plaintiff was seen at Sick Call and received topical cream to treat athletes' foot and batteries for her TENS Unit. *Id*.

On June 20, 2012, Plaintiff was transferred to Gowanda Correctional Facility ("Gowanda C.F."). Dkt. No. 7 at ¶ 29. On the same day, plaintiff's prescriptions for Claritin-D, nasal spray,

Amitriptyline, Omeprazole[12], Tramadol, Finastride[13] and Gabapentin[14] were transferred from Mid-State C.F. to Gowanda C.F. Dkt. No. 66-2 at 3. On June 25, 2012, upon arriving at Gowanda C.F., Plaintiff was examined by a nurse and diagnosed with lower back pain and neuropathy. *Id*. at 2. Plaintiff received a permit for a 12" elastic binder and TENS Unit and was directed to return the items to the Health Service Unit on July 16, 2012. Dkt. No. 66-8 at 4. An "Inmate Limitations" form was completed prohibiting Plaintiff from engaging in strenuous labor or sitting for prolonged periods of time. Dkt. No. 66-8 at 5. The form indicated that the restrictions imposed would remain in effect until July 16, 2012. *Id*.

In July 2012, Plaintiff received the following daily medications: Neurontin (600 mg), Ultram (50 mg), Finasteride and Elavil (10 mg). Dkt. No. 66-1 at 24-45; Dkt. No. 66-2 at 1; Dkt. No. 66-7 at 22. Plaintiff requested and received a battery for her TENS Unit, antifungal cream and dandruff shampoo. Dkt. No. 66-1 at 25. On July 9, 2012, plaintiff was examined and diagnosed with chronic nasal allergies, sinusitis and lower back pain. Dkt. No. 66-2 at 2. At that time, Plaintiff also received a permanent permit for "3rd Floor or Lower Housing" due to "health/medical reasons." Dkt. No. 66-7 at 25. In addition, Plaintiff's medical limitations were modified. Plaintiff was restricted from strenuous labor and from lifting more than fifteen pounds for an "indefinite" period of time. *Id*. at 24.

In August 2012, Plaintiff received the following daily medications: Neurontin (600 mg),

---

[12] Prior to 2012, during her confinement at DOCCS, Plaintiff received a prescription for Omeprazole (Prilosec). http://www.nih.gov (Last visited March 9, 2016).

[13] Prior to 2012, during her confinement at DOCCS, Plaintiff received a prescription for Finasteride. Dkt. No. 66 at 14. Finasteride is used to treat enlargement of the prostate gland and frequent/difficult urination. http://www.nih.gov (Last visited March 9, 2016).

[14] Prior to 2012, during her confinement at DOCCS, Plaintiff received a prescription for Gabapentin for radicular pain. Dkt. No. 66-5 at 20; Dkt. No. 66-5 at 24.

Elavil (10 mg) and Ultram (50 mg). Dkt. No. 66-7 at 21. On August 1, 2012, Plaintiff wrote to Defendant. Dkt. No. 65-5 at 15. Plaintiff advised that she could not walk due to Defendant's decision to "terminate" her muscle relaxers. *Id.* Plaintiff asked Defendant to return her medication. *Id.* Plaintiff also advised that she was denied skin cream for psoriasis. *Id.* On August 7, 2012, plaintiff was treated by a nurse for psoriasis and received a prescription for Lidex to address her skin condition. Dkt. No. 66-1 at 22.

On August 23, 2012, Eileen Dinisio ("Dinisio"), Regional Health Services Administrator, responded to Plaintiff's "recent letter" to Defendant.[15] Dkt. No. 65-5 at 12. Dinisio advised that the Division of Health Services investigated Plaintiff's concerns regarding the staff at Gowanda C.F. *Id.* The investigation revealed that Plaintiff was evaluated by a primary care provider and prescribed Lidex for her skin and Tramadol, Neurontin and Elavil for her "discomfort." *Id.*

In September 2012, Plaintiff received the following daily medications: Neurontin (600 mg), Elavil (10 mg) and Ultram (50 mg). Dkt. No. 66-7 at 19. On September 20, 2012, plaintiff was treated by a nurse for psoriasis and a lesion on her nose. Dkt. No. 66-1 at 21. The nurse noted that Plaintiff's permits for her binder and TENS Unit had expired and that there was, "no clear indication for [the] binder." *Id.* Plaintiff received a new permit for the TENS Unit, a new battery and shampoo. *Id.*; Dkt. No. 66-7 at 20. The renewed permit indicated that the TENS Unit, "[i]s now part of the inmates property and should leave the facility with the inmate." *Id.*

In October 2012, Plaintiff received the following daily medications: Neurontin (600 mg), Elavil (10 mg) and Ultram (50 mg). Dkt. No. 66-7 at 18. On October 16, 2012, plaintiff was treated at Sick Call for psoriasis and foot complaints. Dkt. No. 66-1 at 21. Plaintiff received four TENS pads, a 9-volt battery, anti-fungal cream and dandruff shampoo. *Id.*

---

[15] Dinisio is not a defendant in this action.

**B. Procedural History**

On July 25, 2012, Plaintiff filed her complaint in this action. Dkt. No. 1. On October 29, 2012, Plaintiff filed an amended complaint. Dkt. No. 7. Upon review of Plaintiff's amended complaint, the Court directed Defendant to respond to the allegations in the amended complaint. Dkt. No. 11. On April 12, 2013, Defendant filed a motion to dismiss Plaintiff's amended complaint. Dkt. No. 23. On August 13, 2014, the Court adopted the Report-Recommendation of Magistrate Judge Randolph Treece and dismissed various claims. Dkt. No. 41, 43. Following the Order, the only claim that survived was Plaintiff's claim that Defendant was deliberately indifferent to the allegedly inadequate medical care that Plaintiff received between February 7, 2012 and October 24, 2012 at Mid-State C.F. and Gowanda C.F. Dkt. No. 41 at 21; Dkt. No. 43. In that regard, the Court noted, "[c]rucially, it is unclear what, if any, action Defendant Koengismann took in response to Plaintiff's June 20 and August 1 letters." Dkt. No. 41 at 15.

On July 31, 2015, Defendant moved for summary judgment pursuant to Rule 56. Dkt. No. 65. In support of the motion for summary judgment, Defendant argues that Plaintiff failed to establish that he was personally involved in any constitutional violations. *See* Dkt. No. 65-7 at 6-12. In the alternative, Defendant contends that, based upon the record now before the court, no reasonable factfinder could conclude that Defendant violated Plaintiff's Eighth Amendment rights. *See id.* at 13-15. Plaintiff has opposed Defendant's motion seeking additional discovery and the appointment of counsel. *See* Dkt. No. 71.

### III. DISCUSSION

**A.    Standard of review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal

standard, however, does not excuse a pro se litigant from following the procedural formalities of summary judgment." *Id.* at 295 (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## B.    Personal Involvement

Defendant moves for summary judgment and dismissal of Plaintiff's complaint, in its entirety, arguing that he was not personally involved in any alleged constitutional deprivations. Plaintiff does not claim that Defendant personally treated Plaintiff or provide Plaintiff with any medical care. *See generally*, Dkt. No. 7. Rather, Plaintiff claims that Defendant was personally involved in the alleged deprivations because he has the "responsibility for his policies and procedures or the actions of his staff that were under his control." *See* Dkt. No. 71 at 2. Moreover, Plaintiff contends that Defendant must be aware of the facts surrounding Plaintiff's medical case due to the "twenty months of appeals sent directly to the Defendant." *See* Dkt. No. 7 at ¶ 6.

"It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). With respect to individuals who are sued in their capacities as supervisors, it is well-established that they cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the

part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon*, 58 F.3d at 873.

Conclusory claims that a supervisory official has failed to provide proper training and supervision, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in Colon. *See Bridgewater v. Taylor*, 832 F.Supp.2d 337, 348 (S.D.N.Y. 2011); *White v. Fischer*, No. 9:09-CV-0240, 2010 WL 624081, at *6 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) (affirming dismissal of complaint against supervisor when the complaint did not allege any personal involvement and "lack[ed] any hint that [he] acted with deliberate indifference to the possibility that his subordinates would violate [the plaintiff's] constitutional rights); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ("Dismissal of a section 1983 claim is proper where, as here, the plaintiff 'does no more than allege defendant was in charge of the prison'") (citation omitted).

The receipt of letters or grievances by a supervisor is insufficient to impute personal inovlvement. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *see also Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) (finding that the receipt of two letters, which were referred to other

individuals for response does not establish personal involvement to overcome motion for summary judgment); *see also Smart v. Goord*, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006). It is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus*, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs*., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007)). "Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action." *Liner v. Goord*, 310 F.Supp.2d 550, 555 (W.D.N.Y. 2004).

In this case, Defendant was never responsible for the primary care of Plaintiff, nor did he see Plaintiff in person for care, examination or referrals. Dkt. No. 65-4 at ¶ 5, 14, 15. Defendant acknowledges that Plaintiff wrote letters to him but contends that he did not personally investigate or respond to Plaintiff's correspondence. *Id*. at ¶ 12. Rather, Plaintiff's letters were referred, investigated and responded to by Bogarski and Dinosio. *Id*. at ¶9-11. During her deposition, Plaintiff claimed that she received correspondence directly from Defendant.[16] Dkt. No. 65-3 at 22. During Plaintiff's deposition, defense counsel inquired:

> Q. How did he respond to you?
> A. By written letter.
> Q. Directly from Dr. Koenigsmann?
> A. From him or in his stay by his assistants.
> Q. Do you recall any time in the history of the world where Dr. Koenigsmann personally responded directly to one of your letters?

---

[16] In her Affidavit in Opposition to Defendant's Motion for Summary Judgment, Plaintiff does not address the issue of whether Defendant personally responded to her letters in writing or any other manner.

> A.      I don't recall.
>
> Q.      You have a recollection, howeover, of subordinates of Dr. Koenigsmann responding to your complaints to him?
>
> A.      And I believe he directly responded to the complaints.
>
> Q.      Do you have any document that demonstrates that?
>
> A.      I believe I do and I believe it's in your records, also.
>
> Q.      And you have this document at your home?
>
> A.      Yes.

Dkt. No. 65-3 at 22-23.

Plaintiff was asked how many times Defendant wrote to her directly and, in response she testified that the answer to that question was in records that were in Defendant's possession and had not yet been produced. Dkt. No. 65-3 at 24.

Later in the examination, Plaintiff was again asked if she had "a specific recollection of writing Dr. Koengismann about complaints concerning your care and he responded directly to you?" Dkt. No. 65-3 at 26. Plaintiff responded, "Yes." *Id.* Counsel continued, "[a]nd is it your testimony that you have copies of his direct response to you at your home?" *Id.* Plaintiff responded, "I believe so." *Id.*

After a heated exchange with counsel, Plaintiff was asked the following question and gave the following response:

> Q.      So I'm asking specifically with respect to documents that Dr. Koenigsmann has sent directly to you. You have shared that you have documents like that at home.
>
> A.      Absolutely.

Dkt. No. 65-3 at 30.

A few moments later, Plaintiff was less adamant:

> Q.      All right. It continues to be your testimony at home you have a letter directly written to you by the Deputy Commissioner and Chief Medical Officer of the Depratment of Corrections addressing a complaint that you directed to his attention and that was written sometime after February 6, 2012?
>
> A.      That's something I would have to research.

15

Dkt. No. 65-3 at 35.

At the conclusion of the deposition, Plaintiff indicated that communication from Bogarski and Dinisio was, in his opinion, "direct communication from [Defendant]." Dkt. No. 65-3 at 39-40.

In this instance, the record is devoid of evidence establishing that Defendant personally investigated or responded to Plaintiff's complaints. Plaintiff has not produced any written correspondence directly from Defendant or other documentation establishing that Defendant was personally involved in any decision related to her medical care. To the extent that Plaintiff attempts to establish that Defendant was personally involved because he was "responsible for his policies," the record before the Court lacks any evidence that Defendant created any policy or custom that resulted in a constitutional violation. Moreover, the allegation that Defendant was responsible for the staff "under his control," is conclusory and unsupported by the record. "Personal involvement may be imputed where a supervisor engaged in 'grossly negligent supervision of subordinates who committed a violation.' " *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003). Here, there is no evidence of negligent supervision of any subordinate. Indeed, Plaintiff has not identified any subordinate who allegedly committed a wrongful act.

In cases with similar factual scenarios, Courts in this district have held that Defendant was not personally involved in the alleged Eighth Amendment violations. *See Lawrence v. Evans*, No. 14-CV-6444, 2015 WL 5824808, at *4 (W.D.N.Y. Oct. 6, 2015) (finding that "[the] plaintiff's letters to Dr. Koenigsmann, and his responses (via his subordinates) do not satisfy the personal involvement requirement"); *DeMeo v. Koenigsmann*, No. 11 Civ. 7099, 2015 WL 1283660, at *16 (S.D.N.Y. Mar. 20, 2015) (holding that prisoner letters sent to Dr. Koenigsmann, which were referred to and responded to by subordinates, did not establish Koenigsmann's personal

involvement)); *see also Yearney v. Sidorowicz*, No. 13 Civ. 3604, 2014 WL 2616801, at *9

(S.D.N.Y. June 10, 2014) (reasoning that Dr. Koenigsmann's subordinate, writing on his behalf,

was insufficient to establish Dr. Koenigsmann's personal involvement); *see also Brantley v.*

*Fischer*, No. 12-CV-1051, 2013 WL 5466790, at *9 (N.D.N.Y. Sept. 30, 2013) (holding that the

receipt of a letter by Koenigsmann's subordinate which stated that, "Dr. Koenigsmann, Chief

Medical Officer, has asked me to respond to your recent letter concerning your health care issue,"

was insufficient to establish supervisory liability).

 Plaintiff also attempts to defeat Defendant's motion arguing that the matter should be "set

for trial" because she has not been provided with the opportunity to conduct pre-trial depositions.

*See* Dkt. No. 71 at 2.  The Second Circuit has stated:

> [a] party resisting summary judgment on the ground that it needs
> additional discovery in order to defeat the motion must submit an
> affidavit pursuant to Federal Rule of Civil Procedure 56(d) (formerly
> Rule 56(f)), showing: "(1) what facts are sought and how they are to
> be obtained, (2) how those facts are reasonably expected to create a
> genuine issue of material fact, (3) what effort affiant has made to
> obtain them, and (4) why the affiant was unsuccessful in those
> efforts."

*Lunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13 (2d Cir. 2013) (quoting *Meloff v. N.Y.*

*Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995)).  Pursuant to Rule 56(d), if a party opposing a

motion for summary judgment "shows by affidavit or declaration that, for specified reasons, it

cannot present facts essential to justify its opposition, the court may: (1) defer considering the

motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3)

issue any other appropriate order."  Fed. R. Civ. P. 56(d).

 Rule 56(d) "will not be liberally applied to aid parties who have been lazy or dilatory."

*Allstate Ins. Co. v. Administratia Asigurarilor De Stat*, 948 F.Supp. 285, 294 (S.D.N.Y. 1996)

(quoting 10A Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure:

Civil 2d § 2740, 535 (2d ed. 1983)). "A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 927–28 (2d Cir. 1985).

On August 25, 2014, the Court issued a Mandatory Pretrial Scheduling Order which provided that all discovery shall be completed on or before February 26, 2015. Dkt. No. 45. On May 22, 2015, Plaintiff was deposed. Dkt. No. 65-3 at 1. At the conclusion of the deposition, defense counsel demanded that Plaintiff produce letters, in her possession, that she "believed [. . . ] [came] directly from Dr. Koenigsmann." Dkt. No. 65-3 at 41. Plaintiff asked defense counsel to "produce" Bogarski and Dinisio for depositions. *Id.* On May 29, 2015, defense counsel filed a letter motion requesting an extension of time to file dispositive motions in this action. Dkt. No. 63. Plaintiff was served with a copy of the letter. *Id.* On June 3, 2015, the Court issued a Text Order extending the deadline for dispositive motions until July 31, 2015. Dkt. No. 64. Plaintiff was served with a copy of the Text Order. *Id.* On July 31, 2015, Defendant filed the within motion. Dkt. No. 65.

Here, Plaintiff has not met her burden under Rule 56(d). Plaintiff made no attempt at discovery or depositions prior to the close of discovery or, more importantly, for the two month period between her deposition and the filing of the instant motion. Dkt. No. 63 and 64. Significantly, while Plaintiff claims she was unable to conduct any discovery due to financial constraints, Plaintiff does not explain why she failed to seek additional time for discovery or depositions after receiving notice of Defendant's intention to move for summary judgment in July 2015. *See Allstate Ins. Co.*, 948 F.Supp. at 295 (denying a party's objection to summary judgment under Rule 56(d) because the party failed to file an affidavit in support of its

objection, did not explain why it had not commenced discovery, and failed to utilize available discovery even after having actual notice of the opposition's intention to move for summary judgment). There is nothing in the record suggesting that plaintiff attempted to obtain any depositions while discovery was open or that she was somehow unaware of the identity of the witnesses she now seeks to depose. *See Justice v. Wiggins*, No. 9:11-CV-419, 2014 WL 4966896, at *6 (N.D.N.Y. Sept. 30, 2014) (denying the plaintiff's request for discovery because the plaintiff was aware that the "now sought after testimony" from an inmate had potential relevance before the discovery deadline).

Moreover, Plaintiff has not established that "good cause" exists sufficient to reopen discovery. Plaintiff summarily states that she has, "a fundamental right to cross-examine the defendant." *See* Dkt. No. 71 at 2. Plaintiff did not provide an affidavit describing the evidence she seeks to obtain during a deposition or how the testimony she intends to elicit may create a genuine issue of material fact. *See DePaola v. City of New York*, No. 13 Civ. 315, 2013 WL 5597465, at *5 (S.D.N.Y. Oct. 9, 2013). Indeed, despite Defendant's demands, Plaintiff has not produced any evidence that of direct communications from Defendant. A district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered." *Nat'l Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 117 (2d Cir. 2001) (citations omitted) (internal quotations omitted).

Contrary to Plaintiff's conclusory assertions, the Court finds that the undisputed facts establish that Defendant was not personally involved in any alleged constitutional deprivations. Therefore, the Court grants Defendant's motion for summary judgment on this issue.

**D. Deliberate Indifference**

As an alternative ground for summary judgment, Defendant contends that, based upon the record now before the court, no reasonable factfinder could conclude that Defendant violated plaintiff's Eighth Amendment rights. Examining the evidence in a light most favorable to Plaintiff, Plaintiff contends that Defendant was deliberately indifferent to her medical needs in the following respects: (1) she did not receive her TENS Unit in a timely manner; (2) she was not provided with batteries and pads for the TENS Unit as previously prescribed; (3) she was not permitted to consult with a specialist; (4) she was not treated expeditiously for complaints related to psoriasis; and (5) her pain management care was "cut off." *See* Dkt. No. 7 at ¶ 7, 35, 37; Dkt. Nos. 65-5 at 1, 11, 15.

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Hathaway*, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66.

The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *See id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not

averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quotation omitted). Since there is no distinct litmus test, whether a medical condition is serious depends on certain factors, such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). The court should also judge the severity of the denial of care within the context of the surrounding facts and circumstances of the case. *See Smith*, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance*, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id.* at 703; *Chance*, 143 F.3d at 703 (finding that mere disagreement with the prescribed treatment does not amount to deliberate indifference to a serious medical need). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

In the present matter, the undisputed facts in the record demonstrate the absence of any genuine issue of material fact as to Defendant's alleged deliberate indifference. Even assuming

that Plaintiff suffered from a serious medical condition, *see* Dkt. No. 41 at 12, the medical record makes clear that Plaintiff's medical complaints were consistently addressed by facility medical personnel. *See* Dkt. 66, *generally*.

### 1. TENS Unit and Replacement Batteries/Pads

In her March 3, 2012 letter, Plaintiff complained that she had not received her TENS Unit. *See* Dkt. No. 65-5 at 1. Three days later, Plaintiff received her TENS Unit. *See* Dkt. No. 66-2 at 10. While "[c]ruel and unusual punishment may consist of prison officials delaying an inmate['s] access to needed medical care," *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991), the case law of this Circuit "has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (table); *see also Amaker v. Coombe*, No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment does not by itself violate an inmate's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.") (citing cases); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, No. 00 Civ. 4968, 151 F.Supp.2d 303, 312 (S.D.N.Y. 2001) (noting that some delays in receiving medical treatment are common even outside the prison context). Here, Plaintiff has failed to produce any evidence that the three-day delay in receiving her TENS Unit caused her to suffer "substantial harm." The record also lacks facts establishing that Plaintiff's condition was "fast degenerating," "life threatening" or that Defendant attempted to punish plaintiff.

In April 2012, Plaintiff complained that she could not use her TENS Unit in the prescribed manner because she was "told" that she would only receive a replacement battery once every six weeks. Dkt. No. 65-5 at 11. Plaintiff's allegations are contradicted by the record. Indeed, Plaintiff's repeated requests for replacement batteries and pads were timely addressed by medical staff. To wit, on May 15, 2012, June 15, 2012 and July 26, 2012, Plaintiff requested and received replacement batteries and pads for the unit. Dkt. No. 66-1 at 25; Dkt. No. 66-2 at 4, 5. In September 2012, Plaintiff received a new permit for her TENS Unit with a 9-volt battery. Dkt. No. 66-7 at 20. On October 16, 2012, Plaintiff received new pads and batteries for the TENS Unit. Dkt. No. 66-1 at 21. Based upon the record presently before the Court, no reasonable factfinder could conclude that Defendant intentionally delayed supplying or denied Plaintiff's requests for batteries or pads.

### 2. Request for Specialist

In her March 2012 correspondence, Plaintiff requested a consultation with a "specialist." *See* Dkt. No. 65-5 at 1. "Inmates do not have a right to choose a specific type of treatment." *Veloz v. New York*, 339 F.Supp.2d 505, 525 (S.D.N.Y. 2004). Based upon the factual contentions, Plaintiff's dispute is nothing more than a quarrel with the nature of her treatment. *See Wright v. Conway*, No. 05-CV-6723, 584 F.Supp.2d 604, 607 (W.D.N.Y. Nov. 5, 2008) ("[the plaintiff's] complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed."). The decision to refuse to refer a plaintiff to an outside specialist is not a violation of a constitutional right. *See Rowland v. Hildreth*, 1993 WL 287646, at *12 (S.D.N.Y. July 27, 1993) (citing *Estelle*, 429 U.S. at 107)) ("[A] medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment."). Here, the record lacks any facts establishing that Defendant

acted with deliberate indifference or deliberately ignored Plaintiff's complaints of pain. Indeed, Plaintiff received a plethora of prescription medication for chronic low back pain and was routinely treated at Sick Call, by nurse practitioners and consulted with medical providers. Defendant's alleged refusal to arrange for Plaintiff to see a "specialist," does not amount to deliberate indifference.

### 3. Treatment for Psoriasis

In Plaintiff's August 1, 2012 letter, she complained that she was denied skin cream for psoriasis. Dkt. No. 65-5 at 15. The record indicates that one week after writing the aforementioned letter, Plaintiff received a prescription for Lidex to address her skin condition. Dkt. No. 66-1 at 22. As discussed in Part III(D)(1) *supra*, Plaintiff has failed to produce any evidence that the one-week delay in receiving treatment for her skin condition caused her to suffer "substantial harm." *See Peterson v. Scully*, 707 F.Supp. 759, 761 (S.D.N.Y. 1989) (finding that a three-month delay in receiving lotion for dry skin did not provide a basis for a claim under § 1983). The record also lacks facts establishing that Plaintiff's condition was "fast degenerating," "life threatening" or that Defendant attempted to punish Plaintiff.

### 4. Medications

Plaintiff claims that her pills were "crushed." *See* Dkt. No. 7 at 7; Dkt. No. 65-5 at 15. Plaintiff does not identify which medication was "crushed" or when she received medication in this form. Nonetheless, even assuming this conduct occurred, it does not rise to the level of deliberate indifference. *Peace v. Caldwell*, 892 F.2d 1046 (9th Cir. 1990). The record lacks any evidence suggesting that Plaintiff suffered any harm as a result of ingesting medication in this manner. *See DeLeon v. Dexter*, 2011 WL 1334411, at *5 (C.D. Cal. April 5. 2011) (finding no Eight Amendment violation where the plaintiff failed to demonstrate that the defendant was

aware of any substantial risk of harm from crushed Tramadol or that the defendants deliberately disregarded that risk).

In August 2012, Plaintiff complained that Defendant decided to "terminate" her muscle relaxers and pain medication. Dkt. No. 65-5 at 15. In the amended complaint, Plaintiff asserts that as of October 24, 2012, her medications have been "cut in half." Dkt. No. 7 at ¶ 35. Plaintiff does not specify what medication or medications were "taken away" or "terminated." Regardless, the medical record from June 2012 through October 2012 belies her claims. During the relevant time period, Plaintiff received daily doses of Neurontin (600 mg), Ultram (50 mg) and Elavil (10 mg) for her lower back pain. Dkt. No. 66-7 at 18-19, 21-23. The prescribed dosage of each medication remained unchanged and there is no evidence in the record to suggest that these medications were discontinued.

Furthermore, even assuming that Plaintiff's medications were altered, disagreements over medications, including the dosage or decision to discontinue medication, qualify as "an exercise of 'medical judgment' and do not give rise to a constitutional violation." *See Morrison v. Mamis*, No. 08 Civ. 4302, 2008 WL 5451639, at *10 (S.D.N.Y. Dec. 18, 2008) (holding that the decision to switch the plaintiff from Elavil to another prescription pain killer was "adequate" and reasonable) (collecting cases); *see also Patterson v. Lilley*, No. 02 Civ. 6056, 2003 WL 21507345, at *5 (S.D.N.Y. June 30, 2003) (holding that complaints regarding the defendant's decision to lower and discontinue the plaintiff's asthma medication, "are properly characterized as a difference of opinion - plaintiff's desired treatment versus [the doctor's] medical judgment - rather than deliberate indifference"). Moreover, to establish a claim for deliberate indifference with respect to prescription medication, a plaintiff must plead that a defendant was aware that withholding the medication would result in an excessive risk to plaintiff's health. *See Rivera v.*

*Bhavsar*, No. 09-CV-1394, 2012 WL 8302229, at *5 (N.D.N.Y. March 13, 2012); *see also LaBounty v. Coombe*, No. 95 Civ. 2617, 1998 WL 2553, at *4 (S.D.N.Y. Jan. 5, 1998) (finding that the assertion that the prescription was due to be refilled is insufficient to raise an issue of fact that either defendant was deliberately indifferent to his need for medication).

Here, the record is devoid of evidence that Defendant acted deliberately and discontinued Plaintiff's medications as a form of punishment. *See Washington v. Westchester County Dep't of Corrs.*, No. 13 Civ. 5322, 2014 WL 1778410, at *7 (S.D.N.Y. April 25, 2014). Indeed, from February 2012 through October 2012, Plaintiff made no complaints of pain related to her lower back. Plaintiff has failed to provide any evidence to suggest that any decision to discontinue medication "deviated from reasonable medical practice" to amount to deliberate indifference. *See Aikens v. Rao*, No. 13-CV-1088, 2015 WL 5919950, at *4-5 (W.D.N.Y. Oct. 9, 2015) (holding that the defendant's decision to wean the plaintiff from Ultram was based upon medical judgment). At best, Plaintiff's allegations suggest negligence or medical malpractice and are insufficient to establish any constitutional violation. *See Hernandez*, 341 F.3d at 137.

Upon review of the entire record, the Court concludes that Plaintiff's claims of deliberate indifference amount to nothing more than a disagreement with the prescribed medical treatment, which is not actionable under the Eighth Amendment. *See Chance*, 143 F.3d at 703. The record is devoid of any evidence even suggesting that Defendant acted maliciously in delaying or denying Plaintiff access to medical care, or to interfere with any course of treatment prescribed by the various medical professionals who treated Plaintiff while she was in DOCCS custody. The undisputed record before this Court establishes that from February 2012 through October 2012, Plaintiff was repeatedly treated by DOCCS staff for a myriad of complaints

including rhinitis, sinus congestion, athletes' foot, psoriasis, chronic low back pain, dandruff, lesions. Plaintiff received several different prescription medications on a daily basis, had a physical and underwent blood and urine tests. *See* Dkt. No. 66-2 at 5.

Based on the foregoing, the Court finds that the undisputed facts establish that no reasonable juror could find that Defendant acted with deliberate indifference to Plaintiff's serious medical needs; and, therefore, the Court grants Defendant's motion for summary judgment and as to Plaintiff's Eighth Amendment claims.

## E.    Plaintiff's Motion for Counsel

In further opposition to Defendant's motion, Plaintiff states that "without an attorney," she cannot answer the "alleged facts presented by the Defendant." Dkt. No. 71 at ¶ 6. Plaintiff requests an attorney to "prepare for trial" or "aid in pre-trial depositions." *Id.* During the course of this litigation, Plaintiff filed five motions for the appointment of counsel. Dkt. No. 4, 18, 32, 34 and 46. Plaintiff's requests were repeatedly denied, with leave to renew, because the Court was unable to conclude that Plaintiff's position was "likely to be of substance." Dkt. No. 11 at 7.

In light of the Court's decision to award summary judgment in favor of Defendant, Plaintiff's renewed motion for the appointment of counsel is denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Clerk of the Court is directed to modify the docket to reflect the proper spelling of Defendant's name; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 65) is **GRANTED**;

and the Court further

**ORDERS** that Plaintiff's claims are **DISMISSED with prejudice**; and the Court further

**ORDERS** that Plaintiff's request for additional discovery and appointment of counsel (Dkt. No. 71) are **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal taken from this Memorandum-Decision and Order would not be taken in good faith; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  March 14, 2016
       Albany, New York

Mae A. D'Agostino
U.S. District Judge